# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AURELIO MONTANO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 14 C 2416 |
| | ) |
| WEXFORD HEALTH SOURCES, | ) Judge John J. Tharp, Jr. |
| INC., SALEH OBAISI, M.D., JASON | ) |
| DUNN, O.D., MICHAEL LEMKE, | ) |
| MICHAEL MAGANA, and TARRY | ) |
| WILLIAMS, | ) |
| | ) |
| Defendants. | ) |

## ORDER

For the reasons set forth in the Statement below, the defendants' motions for summary judgment [112], [121], [126] are granted. The Clerk is directed to enter final judgment for all defendants, without costs. Any scheduled hearings are stricken and any pending motions are denied as moot. Absent a basis for extension, if Montano wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(1). If Montano seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to do so in this Court as well. Fed. R. App. P. 24(a)(1). Civil case terminated.

## STATEMENT

Aurelio Montano, an inmate at Stateville Correctional Center ("Stateville"), has been experiencing pain in his eyes and spells of temporary blindness for the past several years. He has sued two doctors, Dr. Jason Dunn, an optometrist, and Dr. Salah Obaisi, Stateville's former medical director, as well as Wexford Health Sources, Inc. ("Wexford") and several former Illinois Department of Corrections ("IDOC") officials, for deliberate indifference to his vision problems in violation of the Eighth Amendment pursuant to 42 U.S.C. § 1983. The defendants move for summary judgment on Montano's claim for deliberate indifference, which is the only count in his second amended complaint. Because no reasonable jury could find—after Montano has been examined by Dr. Dunn on five occasions, by Dr. Obaisi on at least 12 different occasions, by two other optometrists at Stateville, by two different neurologists from the University of Illinois at Chicago Medical Center ("UIC"), by three different ophthalmologists at outside eye clinics, by a neuro-ophthalmologist on two different occasions, by a psychiatrist, and having undergone multiple MRI scans, an ultrasound of his carotid artery, myriad vision tests, and other diagnostic exams—that Dr. Dunn or Dr. Obaisi were indifferent to Montano's condition, or that there is any basis to extend liability to Wexford or the State of Illinois, the Court grants summary judgment for all defendants.

## BACKGROUND

**A.     Northern District of Illinois Local Rule 56.1**

Courts in this district determine whether to grant or deny summary judgment based on the facts set forth in the parties' Local Rule 56.1 statements. Under the rules set forth by the Northern District of Illinois, "a party filing a motion for summary judgment . . . must serve and file 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (quoting N.D. Ill. R. 56.1(a)(3)). The opposing party then is "required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting N.D. Ill. R. 56.1(b)(3)(B)). The response also may include a separate statement of additional facts that the opposing party believes "require[s] the denial of summary judgment," to which the moving party must respond. N.D. Ill. R. 56(b)(3)(C); *see Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). However, if the opposing party's response "fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the motion" for summary judgment. *Cracco*, 559 F.3d at 632; *accord* N.D. Ill. R. 56(b)(3)(C).

The defendants all filed Rule 56.1 statements of material fact with their motions for summary judgment. (ECF Nos. 114, 122, 128.) For the most part, the facts asserted in those statements are supported by materials in the record. Moreover, consistent with Local Rule 56.2, the defendants provided Montano with notices that explain what is required of him to oppose summary judgment. (ECF Nos. 111, 124, 129.) Montano responded to those submissions by filing only a collection of affidavits from other Stateville inmates, (ECF No. 132); he did not otherwise file a response to any of the defendants' Rule 56.1 statements or provide an additional statement of facts. Montano's response therefore does not comply with Local Rule 56.1(b)(3) and the Court accepts as true the facts set forth in the Defendants' Rule 56.1 statements. *See, e.g.*, *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation.") (citations omitted); *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (stating that the Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1" in affirming district court's decision to deem 42 of 47 paragraphs in defendants' Rule 56.1 statement admitted) (citations omitted).

Montano's status as a *pro se* litigant at the time of summary judgment does not excuse him from complying with Local Rule 56.1. *See Milton v. Slota*, 697 F. App'x 462, 464 (7th Cir. 2017) ("[T]he court was entitled to strictly enforce the local rule, even against a pro se litigant, by deeming uncontroverted statements of material fact admitted for purposes of deciding summary judgment."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (stating that "the Supreme Court has made clear that even *pro se* litigants must follow rules of civil procedure" in finding that district court did not abuse discretion in adopting defendants' statement of facts

where *pro se* plaintiff failed to comply with Local Rule 56.1) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)). And to be clear, although he is now proceeding *pro se*, Montano had been represented earlier in this litigation. The Court twice recruited counsel to represent Montano. (Orders, ECF Nos. 4, 79.) Both attorneys, however, were permitted to withdraw after reporting to the Court that they could not proceed due to their assessment of the viability of Montano's claim. (Orders, ECF Nos. 75, 94.) After the second attorney withdrew, the Court declined to recruit additional counsel for Montano. (Orders, ECF Nos. 105, 136.) Nevertheless, because Montano is *pro se* at this juncture, the Court has considered a number of other materials in an effort to determine whether there ***could be*** a material issue of disputed fact for trial, including: any statements in the second amended complaint to which Montano could attest, the exhibits attached to the second amended complaint, the affidavits Montano filed as part of summary judgment, and Montano's deposition testimony. *See Boykin v. Dart*, No. 12 C 4447, 2014 WL 5611466, at *6 (N.D. Ill. Nov. 4, 2014) (discussing how district courts often afford *pro se* plaintiffs "significant leeway in responding to summary judgment filings"). But to the extent that Montano has failed to contradict facts set forth in the defendants' Rule 56.1 statements, those facts are deemed to be admitted.

**B.    Facts**

Montano is an IDOC inmate who has been incarcerated at Stateville since 1998. (SOF ¶ 1.)[1] On October 15, 2012, he was examined by Dr. Dunn, an optometrist at Stateville. (*Id.* ¶ 8.) Dr. Dunn identified Montano as being near- and farsighted, noted that Montano had "ocular allegories," and ordered Montano new eyeglass lenses and eye drops. (*Id.* ¶¶ 8, 55, Ex. C at 1.) Montano did not complain of any vision problems during this visit. (*Id.* ¶ 56.)

In late December 2012, however, Montano claims that he began to experience issues with his eyes after having been placed in segregation in a cell that, he says, was "condemned." (Montano Dep. 19:15-21:14, 66:16-67:17, ECF No. 114-1.) In a grievance dated February 2, 2013, Montano complained that after being placed in that cell, his "eyes began to swell badly and run – leak constantly," and became so painful and irritated that he could not see "a foot in front of [him]." (Second Am. Compl. ¶ 18, Ex. A.) Montano asked to be compensated for his time in the cell (a total of 21 days) and "to be adequately treated for his eye condition." (*Id.*, Ex. A at 1.) His grievance was denied by a counselor ten days later on the basis that Montano's cell had not been condemned and that his claims otherwise were "[n]ot substantiated." (*Id.*) There is no evidence that any of the defendants were aware of this grievance.

In April 2013, Montano filed three more grievances (including letters addressed to then-Warden Michael Lemke) stating that he had been attempting to see the prison eye doctor, and that he feared he would go permanently blind if he was not treated. (*Id.*, Exs. B-G.) In his grievance dated April 17, 2013, Montano noted that his requests were an emergency as he understood that the Stateville eye doctor was available only eight hours per week and that there was a six to eight month wait for an appointment. (*Id.*, Ex. D at 1-2.) On May 10, 2013, Montano

---

[1] The defendants filed three separate statements of fact; however, the latter two statements adopt and incorporate all of the facts asserted in the prior statements, and number their paragraphs consecutively with the prior statements. (ECF No. 114, 122, 128.) Accordingly, the Court cites to all three statements collectively as "SOF."

wrote another emergency grievance requesting to see an eye doctor. (*Id.*, Ex. H at 1.) He noted here that in addition to submitting several other grievances and letters to the warden, he had alerted the Stateville health care unit and wrote to the eye doctor about his condition. (*Id.* at 2.) Warden Lemke reviewed this grievance on May 23, 2013 and determined that it was not an emergency. (*Id.* at 1.)

Nevertheless, Montano was seen again by Dr. Dunn about two months later, on June 27, 2013. (SOF ¶¶ 9, 57.) Montano reported during this examination that "for several hours at a time," his "vision goes out completely;" that is, he was unable to see out of either eye. (*Id.*, Ex. C at 3.) Dr. Dunn found "no objective evidence to substantiate" Montano's symptoms. (*Id.* ¶¶ 9, 58.) However, he wrote that Montano may need a neurological consultation. (*Id.* ¶ 59, Ex. C at 3.) He also provided Montano with eye drops and artificial tears. (Second Am. Compl. ¶ 25.) The following week, on July 3, 2013, Dr. Obaisi, the then-Medical Director of Stateville, ordered an MRI of Montano's brain. (*Id.*, Ex. K; SOF ¶ 2.) That request was approved by Wexford two weeks later on July 16, 2013. (Second Am. Compl., Ex. L.) Dr. Obaisi then examined Montano on July 29, 2013 in connection with his complaints of vision loss. (SOF ¶ 10.) During this examination, Montano did not complain of any pain in his eyes; nonetheless, Dr. Obaisi provided him with a one-year medical permit for a low bunk and low gallery. (*Id.*)

On August 7, 2013, Wexford Health's Utilization Management sent a fax to the Stateville Medical Director stating that it recently had received a referral from "optometry" (which optometrist is unclear) on Montano's behalf for a neurological consultation. (Second Am. Compl., Ex. M.) The purpose of the referral, which had been approved, was to address "blind spells" and rule out the possibility of a pituitary tumor. (*Id.*) Later that month, Montano visited the Stateville health care unit with continued complaints of head and eye pain. (*Id.* ¶ 30.) The nurses who treated Montano provided him with eye drops and artificial tears. (*Id.*)

Montano was seen again by Dr. Dunn on September 14, 2013. (SOF ¶ 11.) During this examination, Montano reported issues with headaches, irritation, and "sudden loss of vision," and asked about a "possible referral." (*Id.*, Ex. C at 7.) Dr. Dunn again found "no objective evidence to support [Montano's] ongoing complaints of sudden loss of vision." (*Id.* ¶ 62.) He informed Montano that his "ocular findings were normal" and that his headaches "do not appear to be associated with his eyes." (*Id.* ¶ 11, 63.) He also told Montano that there "could be a carotid issue," but that it was up to Dr. Obaisi to approve further testing or examination outside the prison. (*Id.* ¶ 64, Ex C. at 7.)

Shortly after that examination, on September 22, 2013, Montano filed a grievance stating that he has been "refused proper medical treatment" for his eyes and that his vision was getting worse as he could "barely see out [of his] eyes." (Second Am. Compl., Ex. P at 1.) Montano further grieved that he had been given only eye drops to treat his pain, which were not working, and that he requested to be seen by an "outside doctor." (*Id.*) Montano filed two more grievances to the same effect in November 2013. (*Id.*, Exs. Q-R.)

On December 10, 2013, Montano was sent to Presence St. Joseph Medical Center ("Presence") to undergo the brain MRI that Dr. Obaisi had ordered. (SOF ¶ 12.) The reviewing radiologist noted that the MRI results were "normal." (*Id.*) Over the next few months, Montano visited the Stateville health care unit multiple times complaining of eye pain and asking to

4

receive the results of his MRI. Montano again was provided with eye drops and artificial tears and was told that Dr. Obaisi would discuss his MRI results with him. (Second Am. Compl. ¶¶ 38-41, Ex. T.) On March 4, 2014, Dr. Obaisi met with Montano and informed him that his MRI results had not revealed any issues. (SOF ¶ 13.) Moreover, although there still were no clinical findings to support Montano's complaints, Dr. Obaisi referred him for outside neurology and ophthalmology evaluations. (*Id.*)

Three weeks later, on March 27, 2014, Dr. Dunn examined Montano again. (*Id.* ¶ 14.) Montano continued to report sudden losses in vision and asked to be referred to a neuro-ophthalmologist. (*Id.* ¶¶ 65-66.) Dr. Dunn again found Montano to be near- and farsighted and did not identify any objective evidence to support Montano's complaints of vision loss. (*Id.* ¶¶ 14, 67.) Dr. Dunn informed Montano that he had been approved for a neuro-ophthalmology consultation and that there was nothing more he could do. (*Id.* ¶¶ 68-69.)

In early April 2014, Montano was sent to the Stateville infirmary after reporting he had temporarily lost sight in both of his eyes. (Second Am. Compl. ¶ 44; Irving and Stackhouse Affs., ECF No. 132.) He stayed in the infirmary for observation for approximately four days. (Second Am. Compl. ¶ 44.) Following his time in the infirmary, Montano filed several new grievances requesting to see outside specialists to obtain a diagnosis of his symptoms. (*Id.*, Exs. W-X, Z, AA.) On April 17, 2014, Montano was approved by Wexford to see an outside ophthalmologist. (*Id.*, Ex. Y.)

The following month, Montano was seen by both a neurologist and an ophthalmologist. He first was examined on May 7, 2014 by Dr. Rebbeca Gryziewicz, a neurologist at UIC. (SOF ¶ 15.) Dr. Gryziewicz's observed that Montano had "poor visual acuity," but that he had "no tenderness" in his temples and that the rest of his test results were "wnl [within normal limits]." (*Id.* ¶ 15, Ex. C at 18.) She further noted that the cause of Montano's vision issue was "unclear." (*Id.* ¶ 15.) On May 12, 2014, Montano was examined by Dr. Alen Hein, an ophthalmologist at the Aurora Eye Clinic. (*Id.* ¶ 16.) Dr. Hein reported "[n]o ocular problems" and that Montano's eye and vision examination was "[n]ormal." (*Id.*, Ex. C at 21.) A week later, on May 19, 2014, Dr. Obaisi met with Montano and explained to him that neither specialist found any "anatomical deficit in [his] eyes." (*Id.* ¶ 17.) Dr. Obaisi then prescribed Montano a medication used to treat high blood pressure, as he suspected Montano's vision problems could be related to an issue with his carotid artery. (*Id.*) Shortly after this appointment, Montano filed another grievance requesting additional treatment. (Second Am. Compl. Ex. FF.)

Montano continued to be monitored over the next several months. In June 2014, Dr. Obaisi met with him for a follow-up examination, during which Montano reported no change in vision. (SOF, Ex. C at 28.) On August 21, 2014, however, Montano experienced another episode of temporary blindness. (Second Am. Compl. ¶ 58.) He was seen by Dr. Obaisi later that day and was admitted to the health care unit for another four days of observation. (*Id.*; SOF, Ex. C at 31.) Dr. Obaisi saw Montano again on August 28, 2014, at which time he extended Montano's medical permits for a low bunk and low gallery, and provided Montano with eye drops and Motrin for pain relief. (SOF ¶ 18, Ex. C at 32.) On September 5, 2014, Dr. Dunn examined Montano again, and again found no physiological evidence to support Montano's claims. (*Id.*

¶¶ 20, 70-72.)[2] Montano then met with Dr. Obaisi for follow-up appointments in November 2014 and January 2015. (*Id.* ¶ 18.) Dr. Obaisi noted during these visits that Montano's test results had been within normal limits. (*Id.*, Ex. C at 34-35.)

In 2015, Montano was seen by several other doctors and underwent additional testing. In July, he was examined by a new Stateville optometrist, Dr. George Nista, who noted that Montano was waiting for test results from UIC. (*Id.* ¶ 20, Ex. C at 36.) On August 10, 2015, Montano was sent to UIC for a neurological evaluation with Dr. Nicolas Martin. (*Id.* ¶ 21.) He reported to Dr. Martin that he had completely lost vision in his left eye six to eight months prior and that he continued to have burning in his eyes. (*Id.*, Ex. C. at 37-38.) Dr. Martin, however, found that Montano appeared to have some "element of [left] eye vision preserved as evidence by +OKN [positive optokinetic]" test results. (*Id.* ¶ 21, Ex. C at 38.) Dr. Martin also wrote that he was unable to determine the etiology of Montano's symptoms and recommended further testing and evaluation. (*Id.* ¶ 21.) The next day, Montano underwent an ultrasound of his carotid arteries. (*Id.* ¶ 22.) The test showed "[n]o elevated flow velocities to indicate flow-limiting stenosis." (*Id.*) In September and October 2015, Montano went back to UIC for a visual field test and an examination with Dr. Eric Feinstein, an ophthalmologist. (*Id.* ¶¶ 24-25). Dr. Feinstein reported that Montano's eyes "appear healthy" and that there was "no clear etiology" for his symptoms. (*Id.* ¶ 25.) He did, however, rule out a pituitary tumor as an explanation for Montano's symptoms. (*Id.*)

Montano next underwent testing with Dr. Peter MacIntosh, a neuro-ophthalmologist at UIC. During Dr. MacIntosh's first examination, on November 18, 2015, Montano reported that he could not perceive light in either eye. (*Id.* ¶ 26.) However, later in the day, Montano responded to light sensitivity tests and was able to follow his image in a mirror held in front of him. (*Id.*) Dr. MacIntosh noted that he could not be sure of the cause of Montano's vision loss, but suggested conversion as a possible diagnosis, which is a mental condition in which the patient experiences blindness that cannot be explained by medical evaluation. (*Id.* ¶¶ 26-27.) He also recommended that Montano undergo an MRI of his digital orbits, and that procedure took place on December 22, 2015. (*Id.* ¶¶ 26, 29.) Following that MRI, which was noted as being "[u]nremarkable," Dr. MacIntosh saw Montano again on February 19, 2016. (*Id.* ¶¶ 29, 31.) Following this examination, Dr. MacIntosh reported that he still could not determine the cause of Montano's vision problems, noted that Montano's test results were "normal . . . except for visual acuity and fields which fluctuate wildly from visit to visit and even within the same visit," and referred Montano to a psychiatrist. (*Id.* ¶ 31.)

In March 2016, Dr. Obaisi met with Montano to discuss Dr. MacIntosh's findings and recommendations, and referred Montano for a psychiatric consultation. (*Id.* ¶¶ 32-33.) Montano subsequently met with a psychiatrist at Stateville; however, that evaluation did not reveal any new results. (Montano Dep. 50:13-51:17.) In May 2016, Montano received an optometry examination at Stateville from Dr. Krystel Miller. (SOF ¶ 34.) Montano continued to report vision issues and burning in his eyes, but denied any history of trauma. (*Id.*, Ex. C at 67.) Dr. Miller referred Montano to UIC for further testing. (*Id.*)

---

[2] This was Dr. Dunn's final examination of Montano; Dr. Dunn stopped providing optometric services to inmates at Stateville in November 2014. (SOF ¶ 73.)

6

In August 2016, Dr. Obaisi met with Montano for a follow-up examination and informed him that he had been approved for another ophthalmology evaluation at UIC. (*Id.* ¶ 35.) Dr. Obaisi noted, however, that he was waiting for UIC to provide dates for an appointment. (*Id.*) On October 22, 2016, Montano was examined by Dr. Mark Dikopft, an ophthalmologist at UIC. (*Id.* ¶¶ 35-36.) Dr. Dikopf reported that he was unable to find "evidence of a pathology" and suggested that Montano obtain a psychiatric evaluation. (*Id.* ¶ 36, Ex. C at 69.) Montano then met with Dr. Obaisi for two more follow-up visits, one in October and one in November 2016. (*Id.* ¶ 37.) As of June 2017, the date of Montano's deposition, no physician had diagnosed the problems Montano claimed with his eyes or vision. (*See id.* ¶ 38.) Nor has any physician informed Montano that his vision could have been better preserved had he been referred outside of Stateville sooner. (*Id.* ¶ 39.)

## C. Procedural Posture

Montano filed a one-count complaint alleging that Dr. Dunn,[3] Dr. Obaisi,[4] Wexford, and three former Stateville wardens, Michael Lemke, Michael Magana, and Tarry Williams, have been deliberately indifferent to his ocular problems. Following discovery, all of the defendants moved for summary judgment. Dr. Obaisi and Wexford argue that Montano has not shown that he suffers from a serious medical condition and that, even if he does, he was provided with a comprehensive course of treatment that cannot establish indifference. (Wexford and Obaisi Mot. for Summ. J. 7-13, ECF No. 113.) Dr. Dunn similarly argues that Montano cannot establish the elements of his claim as there is no objective medical evidence to support his complaints of vision loss. (Dunn Mot. for Summ. J. 5-6, ECF No. 123.) Finally, the former Stateville wardens point out that they have been sued only in their official capacities for injunctive relief and that Montano has already received the care he requests in his complaint. (Williams, Magana, and Lemke's Mot. for Summ. J. 4-5, ECF No. 127.) Having reviewed the parties' submissions, the Court grants summary judgment in their favor of all defendants on Montano's claim.

---

[3] Dr. Dunn was sued in both his individual and official capacities. Although Dr. Dunn does not discuss his official capacity claim in his motion for summary judgment, he has moved to dismiss it under Rule 12(b)(6), arguing that it is barred under the Eleventh Amendment. (Def. Dunn Mot. to Dismiss Pl. Second Am. Compl. 10, ECF No. 98.) Dr. Dunn does not clarify in his motion whether he was an employee of the State of Illinois or Wexford at the time he treated Montano. But in either case, his official-capacity claim is duplicative of other claims asserted. If, as seems most likely, Dr. Dunn was an employee of Wexford, the claim is subject to dismissal as duplicate of the claim asserted against Wexford. (*See* Order, ECF No. 47 (dismissing official capacity claim against Dr. Obaisi on same basis).) If, on the other hand, he was a state employee, then the claim is the same as the one asserted against the IDOC Defendants, who were sued only in their official capacities. In short, the official capacity claim against Dr. Dunn adds nothing to Montano's complaint.

[4] The Court understands that Dr. Obaisi recently passed away. However, because no one in this suit has filed a notice of death or sought leave to substitute another party in place of Dr. Obaisi pursuant to Federal Rule of Civil Procedure 25, the Court will analyze Montano's deliberate-indifference claim against Dr. Obaisi. If, for some reason, a motion for substitution is filed after this order is entered, the Court will consider the motion at that time.

**ANALYSIS**

Summary judgment is appropriate only if the defendants show that there is "no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa County*, 752 F.3d 708, 712 (7th Cir. 2014). When considering a motion for summary judgment, the Court construes "all facts and makes all reasonable inferences in favor of the non-moving party." *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal quotation marks and citations omitted). Rather, the Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citation omitted).

**A.   Medical Defendants**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eight Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted). "To prevail on a deliberate-indifference claim, the plaintiff must prove that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately indifferent, that is, subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quotation marks and citation omitted). "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014) (citing *Whitley v Albers*, 475 U.S. 312, 325 (1986)).

The defendants maintain that Montano is not suffering from a serious medical condition because Montano can point to no diagnosis explaining his eye problems. (Obaisi and Wexford Mot. Summ. J. 8-9.) They argue that despite the numerous examinations and tests that Montano has undergone—administered by myriad healthcare professionals (some employed by Wexford, others independent)—no one has been able to identify a physiological problem that accounts for Montano's complaints concerning his eyesight. At most, they argue, Montano suffers from a psychiatric issue and he already has been referred for psychiatric treatment. But whatever the cause may be, Montano's complaints and symptoms have been continual and, at least at times, debilitating. And just because medical professionals have not been able to identify or explain a serious medical condition does not eliminate the possibility that there is one. *See Pyles*, 771 F.3d at 409 (stating that a medical condition is objectively serious if *either* "a physician has diagnosed it as requiring treatment, *or* the need for treatment would be obvious to a layperson") (emphasis added) (citation omitted). Thus, although there is a dispute about whether Montano is, in fact, suffering from a serious medical condition, the Court will assume he is for purposes of summary judgment and address only the second element of Montano's claim: deliberate indifference.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health and safety.'" *Whiting*, 839 F.3d at 662 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm

exists, and he must actually draw the inference." *Id.* (citations omitted). This standard requires more than mere negligence or even medical malpractice, "and it approaches intentional wrongdoing." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("[N]either medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference . . . .") (citations omitted). Yet, summary judgment is improper where there is evidence that "the defendants knew better than to make the medical decisions that they did." *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (en banc). Thus, an inmate may proceed to trial if he has proof that the defendants provided him with "blatantly inappropriate" treatment, ignored the recommendation of specialists, or needlessly delayed his treatment (which increased his pain). *Stewart v. Wall*, 688 F. App'x 390, 392 (7th Cir. 2017); *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).

With these principles in mind, the Court considers whether Dr. Dunn and/or Dr. Obaisi (the "Medical Defendants") were deliberately indifferent to Montano's vision issues. Montano's claim against these doctors appears to be threefold: (1) they delayed in providing him treatment, (2) failed to accurately diagnosis his condition, and (3) denied him access to certain specialists and testing. (Second Am. Compl. ¶ 77; Pl. Supp. Argument 1-2, ECF No. 135.)

### 1. Delays in Treatment

The Court turns first to the issue of delay. Although Montano fails to explain what delays in treatment he believes were unconstitutional, the Court nevertheless will examine three that Montano focuses on in his complaint. The first period of delay concerns when Montano initially was treated for his eye pain and temporary blindness. Montano reported experiencing these issues sometime after December 19, 2012, but was not examined for this complaint until Dr. Dunn saw him in June 2013. Despite the length, this delay does not give rise to an Eighth Amendment violation against the Medical Defendants. For starters, there is no evidence that a four-month wait[5] to see the prison optometrist is out of the ordinary or that Montano's symptoms warranted more immediate attention. *See Petties*, 836 F.3d 722 ("[D]elays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment."). To be sure, an inmate's subjective complaints that he is going blind would seem to warrant prompt attention; however, in this case, there is no medical evidence that corroborates Montano's claim of eye pain or that he was experiencing hour-long spells of blindness at the time. Indeed, when Montano was finally examined in June 2013, Dr. Dunn found nothing to support Montano's complaints. Nor has any other medical professional since then.

Furthermore, Montano has not presented any evidence that the Medical Defendants actually knew about the initial period of delay.[6] *See Harvey v. Ghosh*, No. 11 C 6716, 2015 WL

---

[5] Although he says his eye problems began in December 2012, Montano did not file a grievance complaining about his eyes until February 2013 and was examined by Dr. Dunn in June of that year.

[6] Although Montano indicated in a grievance dated May 10, 2013 that he "wrote to the eye doctor" about his condition, this statement cannot be used to establish Dr. Dunn's

8329876, at *5 (N.D. Ill. Dec. 9, 2015) (finding that even though 218-day delay in inmate receiving x-ray was "extraordinary," doctor could not be liable for indifference because he was not aware of delay); *Poff v. Schettle*, No. 15-CV-954-JPS, 2017 WL 2728430, at *7 (E.D. Wis. June 23, 2017) (finding dental staff could not have been deliberately indifferent for five-day delay in treatment because they did not know of plaintiff's condition beforehand). On the contrary, Dr. Dunn testified that Montano did not report any vision problems to him until June 27, 2013. Dr. Obaisi similarly testified that the first time he examined Montano for eye pain and vision issues was on July 29, 2013, and that he did not see Montano's written requests for medical attention before then.

The second and third delays relate to the scheduling of Montano's initial MRI and first neurological consultation. Montano was approved for an MRI in July 2013 and referred to a neurologist sometime between late June and early August 2013, but Montano did not undergo the MRI until December 2013 and did not see the neurologist until May 2014. Yet, there is simply no basis to infer deliberate indifference from the fact that scheduling consultations with outside experts required significant lead time. In particular, Montano has not shown that the Medical Defendants had any control over when the MRI (which took place at Presence) or the neurological consultation (which occurred at UIC) were scheduled. *See Stewart*, 688 F. App'x at 394 (affirming summary judgment for defendants where inmate failed to argue or present evidence that the defendants had control over the delays in providing medical supplies at issue).[7] Nor does the record indicate that the delay was due to inaction on the part of the Medical Defendants. Dr. Dunn appears to have recommended the neurological consultation shortly after he examined Montano on June 27, 2013, and that request was approved by Wexford in early August 2013. Moreover, Dr. Obaisi ordered Montano's MRI on July 3, 2013—a week after Dr. Dunn's examination—and his request was approved by Wexford two weeks later, on July 16, 2013. Therefore, Montano cannot base his deliberate indifference claim against the Medical Defendants on the delays in actually obtaining this treatment.

---

knowledge. (Second Am. Compl., Ex. H at 2.) As an initial matter, that unattested statement, as written, is hearsay that cannot be used to establish that Montano did, in fact, send Dr. Dunn a letter about his condition. *See* Fed. R. Evid. 801-02. But even if Montano had attested to sending Dr. Dunn a letter (assuming the eye doctor referenced is Dr. Dunn), that testimony would not establish that Dr. Dunn received the letter, let alone when. And in any event, even if Dr. Dunn received the letter in mid-May, he saw Montano again only about a month later.

[7] Montano also fails to demonstrate that any the delays in treatment "exacerbated [his] injury or unnecessarily prolonged [his] pain." *Petties*, 836 F.3d at 731. While Montano believes that his visual acuity and eye pain became worse due to the delay, he has not "place[d] verifying medical evidence in the record to establish" a connection between any delay and his worsen symptoms. *Lloyd v. Moats*, No. 16-3939, 2017 WL 6728519, at *3 (7th Cir. Dec. 29, 2017) (quoting *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996)). To the contrary, the evidence of record demonstrates that there has never been any physiological explanation for Montano's complaints about his vision and that his condition has not changed over time.

## 2. Lack of Clinical Diagnosis

Nor can Montano establish that the Medical Defendants violated the Eighth Amendment by failing to diagnosis his symptoms or prevent his loss of vision. Even where a defendant recognizes a substantial risk of harm to an inmate, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843). Here, the record shows that Medical Defendants responded reasonably to Montano's ocular problems. Dr. Dunn examined Montano's eyes four times between June 2013 and September 2014. During that time period, he found no objective evidence to support Montano's symptoms. Nonetheless, he recommended that Montano be seen by a neurologist to evaluate his head and eye pain more thoroughly, and later suggested that Montano undergo testing to rule out an issue with his carotid artery. On several occasions, Dr. Dunn also provided Montano with eye drops to treat his pain.

Dr. Obaisi's treatment of Montano was even more extensive. Starting in July 2013, he ordered Montano to undergo a battery of tests, including several MRIs and an ultrasound, and referred him to a litany of specialists, including ophthalmologists and neurologists. Although Montano continuously complained to Dr. Obaisi and others that he was in pain and that his vision was getting progressively worse (to the point he lost vision in one eye), the tests results were all consistently normal and the specialists reported that Montano's eyes appeared to be healthy or within normal limits. Despite these findings, Dr. Obaisi continued to evaluate and monitor Montano through at least November 2016. Moreover, during his visits with Montano, Dr. Obaisi discussed recent test results as well as the findings and recommendations of specialists, and also ordered eye drops and other medication to alleviate Montano's eye pain.

At bottom, the Medical Defendants provided Montano with a continuous course of care that sought to determine the cause of his blindness and address his eye pain. Although the defendants were ultimately unsuccessful in their efforts to identify and resolve the cause of Montano's eye problems, it was not for lack of trying, and there is no evidence that the treatment they pursued was a departure from professional standards, let alone constitutionally inadequate. *See Lloyd*, 2017 WL 6728519, at *3 (emphasizing record "of continuous care" in finding no deliberate indifference); *Proctor v. Sood*, 863 F.3d 563, 567-68 (7th Cir. 2017) (concluding that doctors were not subjectively indifferent to inmate's abdominal pain and colon spasms where they performed extensive testing, but the results were consistently normal); *Holloway*, 700 F.3d at 1073 (affirming summary judgment for doctor where inmate provided no evidence that doctor knew medication would be insufficient to alleviate symptoms or that failure to prescribe other medication was departure of professional standards). This kind of "meaningful and ongoing assessment of a patient's condition is the antithesis of 'deliberate indifference.'" *McGee v. Adams*, 721 F.3d 474, 482 (7th Cir. 2013). In view of these efforts, a reasonable jury could not find that the Medical Defendants acted with deliberate indifference based on the fact that no one has yet identified a cause for Montano's symptoms or been able to stem his vision loss.

## 3. Failing to Authorize Certain Tests and Referrals

Montano also claims that the Medical Defendants were deliberately indifferent due to their failure to order certain tests and refer him to certain types of specialists. In particular, he argues in his response that he should have should sent to a neuropsychologist to assess issues

relating to traumatic brain injury. (Pl. Supp. Argument, 1-2.) But Montano was sent on outside consultations with neurologists and was seen by at least one psychiatrist at Stateville. Moreover, he fails to explain how a neuropsychologist would have been able to address his vision problems (especially considering he has denied a history of trauma), or that failing to refer him was a substantial departure from accepted medical practices. *See Harper v. Santos*, 847 F.3d 923, 928 (7th Cir. 2017) (affirming summary judgment where inmate did not show how ordered blood and urine tests failed to adequately monitor kidney or that relying on such tests was inappropriate). Montano is not entitled to dictate which specialists he should see; that decision is a matter of medical discretion that does not give rise to a constitutional violation unless blatantly inappropriate. *Pyles*, 771 F.3d 403; *see also Frobes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[Plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him].")

Montano also alleges in the complaint that the Medical Defendants failed to schedule a neurological consultation to examine his head and eye pain and to rule out the possibility of a pituitary tumor. But that is not so. Not only was Montano evaluated by a neurologist prior to the filing of the second amended complaint, he was examined by a second neurologist and a neuro-ophthalmologist afterward. Montano also underwent testing that ruled out a pituitary tumor as the cause of his symptoms. Thus, there is no basis to conclude that the Medical Defendants were deliberately indifferent and the Court grants summary judgment in their favor.

**B.    Wexford**

Montano contends that Wexford was deliberately indifferent to his vision problems as well. To prevail against Wexford, Montano must show that it had an official policy, pattern, or practice that caused a constitutional violation. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (*Monell* liability "applies in § 1983 claims brought against private companies acting under color of state law"). That policy or practice also must be the "direct cause of" or "moving force behind" Montano's constitutional injury. *Pyles*, 771 F.3d at 409-410 (internal quotation marks and citation omitted). Although the Court has found that Montano has no claim against Dr. Obaisi or Dr. Dunn, liability may still flow to Wexford if its "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017). But the alleged failures in care must be caused by Wexford itself; section 1983 "does not permit liability to rest on the doctrine of *respondeat superior*." *Pyles*, 771 F.3d at 409.

Here, Montano alleges that Wexford had a policy of limiting inmate treatment in order to save costs; however, he has not provided any evidence to establish that policy. That bare assertion also has been repeatedly rejected as a basis for holding Wexford liable on claims of deliberate indifference where, as here, the plaintiff fails to establish an underlying constitutional violation. *See, e.g.*, *id.* at 412. And, even if Wexford had such a policy, there is no basis to infer that it played a role in causing Montano's eye problems because there is no evidence Wexford ever denied him treatment, let alone on the basis of cost, or that Wexford was responsible for any of the delays discussed above. Therefore, the Court grants summary judgment for Wexford.

## C.   IDOC Defendants

Finally, Montano brings suit against Defendants Lemke, Magana, and Williams (the "IDOC Defendants") for deliberate indifference. By suing the IDOC Defendants in their official capacities, Montano effectively is suing IDOC, and in turn, the State of Illinois.[8] *See, e.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001). To be sure, Montano cannot seek monetary relief against the IDOC Defendants. The State of Illinois is not a "person" for purposes of section 1983 liability. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). It also is shielded from damage claims under the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985). Montano may, on the other hand, sue them for injunctive relief, *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011); *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir. 1987) ("The Eleventh Amendment . . . does not bar the award of injunctive or declaratory relief requiring a state official to conform his or her behavior to the requirements of federal law in the future.") (citing *Ex parte Young*, 209 U.S. 123 (1908)), which he has done.

Despite the availability of injunctive relief, the Court must grant summary judgement in favor of the IDOC Defendants for two reasons. First, Montano has failed to establish, let alone allege, an unconstitutional policy by the State of Illinois. Much like his claim against Wexford, Montano must show that the state had a policy, practice, or custom that caused a constitutional violation. *Graham*, 473 U.S. at 166-67 & n.14 ("[I]n an official capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law.") (citations omitted); *see King v. Ghosh*, No. 10 C 6838, 2017 WL 1151059, at *15 (N.D. Ill. Mar. 28, 2017) (granting summary judgment for IDOC employees sued in their official capacities where inmate failed to identify state policy); *Hughes v. Durrent*, No. 15 C 6432, 2016 WL 626800, at *2 (N.D. Ill. Feb. 17, 2016) (dismissing official capacity claims against IDOC personnel sued in their official capacity where inmate failed to allege facts that support unconstitutional policy).

Additionally, Montano no longer has standing to pursue injunctive relief. Because the jurisdiction of federal courts is limited to "actual, ongoing cases or controversies," a claim becomes moot when "there is no longer an injury that can be redressed by a favorable decision." *Ostby v. Manhattan School Dist. No. 114*, 851 F.3d 677, 682 (7th Cir. 2017). Here, Montano asks for an injunction requiring the IDOC Defendants to schedule a neurological consult with doctors at UIC, ensure that Stateville doctors follow any course of treatment recommended by outside specialists, and provide Montano with a copy of his MRI results and to have those results explained to him in Spanish. But Montano has already obtained this relief. Even before the second amended complaint was filed, Montano was seen by a neurologist at UIC and had his MRI results explained to him by Dr. Obaisi.[9] Further, the record indicates that Dr. Obaisi

---

[8] As a clerical matter, "when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending [, t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). The import of this rule here is that Stateville's current warden, Randy Pfister, is the appropriate IDOC Defendant in this case, not Williams, Magana, and Lemke. Nevertheless, because the Court grants summary judgment for the IDOC defendants, there is no need to substitute the parties.

[9] When asked if he ever had trouble communicating with Dr. Obaisi, Montano responded "not really." (Montano Dep. 37:4-7.)

followed all of the recommendations provided to him by outside specialists. At any rate, despite a continuous course of treatment over several years, no medical professional has been able to identify what is wrong with Montano's eyes. Thus, no reasonable jury could find that Montano is suffering from an ongoing violation of the Eighth Amendment.[10] *See Nunez v. Lashbrook*, No. 15-CV-514-SMY-RJD, 2018 WL 514329, at *6-7 (S.D. Ill. Jan. 23, 2018) (granting summary judgment for IDOC warden sued in his official capacity after finding that inmate's claim for injunctive relief was mooted by subsequent course of treatment). The Court therefore grants summary judgment for the IDOC Defendants on Montano's claim.

\* \* \*

For the reasons set forth above, the defendants' motions for summary judgment [112], [121], [126] are granted. The Clerk is directed to enter final judgment for all defendants, without costs. Any scheduled hearings are stricken and any pending motions, including Dunn's motion to dismiss for failure to state a claim [98], are denied as moot. Civil case terminated.

Date: February 7, 2018

John J. Tharp, Jr.
United States District Judge

---

[10] While there are exceptions to the mootness doctrine, such as cases in which an injury is capable of repetition, yet evading review, Montano did not raise any of these exceptions in the response he filed. The Court therefore declines to consider whether any apply here.